# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELISSA GAIL LEONARD,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00007 |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Melissa Gail Leonard, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Leonard protectively filed an application[2] for DIB on March 6, 2009, alleging disability as of January 19, 2008, due to fibromyalgia, stomach blisters, arthritis, chronic back pain, muscle spasms, anger problems, severe depression, anxiety, panic attacks and diarrhea. (Record, ("R."), at 154-55, 172, 176.) The claim was denied initially and on reconsideration. (R. at 81-83, 87-89, 92-95, 97-99.) Leonard then requested a hearing before an administrative law judge, ("ALJ"), (R. at 100-01.) The hearing was held on July 26, 2011, at which, Leonard was represented by counsel. (R. at 28-54.)

By decision dated August 25, 2011, the ALJ denied Leonard's claim. (R. at 14-23.) The ALJ found that Leonard met the nondisability insured status

---

[2] Leonard also filed an application for supplemental security income, ("SSI"); however, it was determined that she was not eligible to receive SSI. (R. at 75-79, 156-64.)

requirements of the Act for DIB purposes through June 30, 2008.³ (R. at 16.) The ALJ also found that Leonard had not engaged in substantial gainful activity since January 19, 2008, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that, through the date last insured, Leonard suffered from severe impairments, namely fibromyalgia, chronic lower back pain and depression, but he found that Leonard did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ also found that, through the date last insured, Leonard had the residual functional capacity to perform sedentary work⁴ that allowed for moderate difficulties in maintaining concentration, persistence or pace. (R. at 18.) The ALJ found that, through her date last insured, Leonard was unable to perform her past relevant work. (R. at 21.) Based on Leonard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Leonard could perform, including the job as a charge account clerk, a telephone information clerk and an addressing clerk. (R. at 21-22.) Thus, the ALJ found that Leonard was not under a disability as defined under the Act and was not eligible for benefits. (R. at 22-23.) *See* 20 C.F.R. § 404.1520(g) (2013).

---

[3] Therefore, Leonard must show that she became disabled between January 19, 2008, the alleged onset date, and June 30, 2008, the date last insured, in order to be entitled to DIB benefits.

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a) (2013).

After the ALJ issued his decision, Leonard pursued her administrative appeals, (R. at 7-9), but the Appeals Council denied her request for review. (R. at 1-5.) Leonard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Leonard's motion for summary judgment filed September 13, 2013, and the Commissioner's motion for summary judgment filed October 16, 2013.

## II. Facts

Leonard was born in 1975, (R. at 33, 154), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Leonard has a high school education and past relevant work experience as a cashier, a dishwasher, a housekeeper and a computer technician. (R. at 33, 37-39, 177, 181.)

Vocational expert, Asheley Wells, was present and testified at Leonard's hearing. (R. at 48-53.) Wells classified Leonard's work as a housekeeper as medium[5] and unskilled and her work as a small parts assembler and cashier as light[6] and unskilled. (R. at 48-49.) Wells was asked to consider a hypothetical individual of Leonard's age, education and work history who would be limited as set out in the assessment of Dr. Michael Moore, M.D. (R. at 49-50, 300-02.) Wells

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2013).

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

stated that there would be no jobs available that such an individual could perform. (R. at 50.) Wells was asked to assume an individual who was capable of performing a full range of sedentary work who had a mild reduction in concentration, persistence and pace. (R. at 50.) Wells stated that such an individual could perform the jobs of a charge account clerk, a telephone information clerk and an addressing clerk, all of which existed in significant numbers. (R. at 51.) When asked to consider the same individual, but who had a moderate reduction in concentration, persistence and pace, Wells stated that the individual could perform the jobs identified. (R. at 52.) However, Wells stated that, if the individual could not complete a full workday on a fairly regular basis or missed at least one day a week, there would be no jobs available that such an individual could perform. (R. at 52.)

In rendering his decision, the ALJ reviewed medical records from Wise County Public Schools; Dr. Michael Hartman, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Brian Strain, M.D., a state agency physician; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Lee T. Besen, M.D.; Dr. R. Michael Moore, M.D.; and Lonesome Pine Hospital.

The record shows that Leonard presented to the emergency room at Lonesome Pine Hospital sporadically from 2005 through 2010 for multiple complaints including toothache, jaw pain, left knee pain, anxiety, back pain, pelvic pain and dysfunctional uterine bleeding. (R. at 304-27.) On two occasions,[7] Leonard complained of back pain after moving furniture and falling. (R. at 319-

---

[7] These medical reports are not dated. (R. at 319-22.)

22.) She was diagnosed with chronic back pain and acute back strain. (R. at 320, 322.) In July 2007, Leonard complained of feeling "jittery," shortness of breath, increased heart rate and moderate anxiety. (R. at 311-12.) She reported that her husband was in the hospital, which was believed to be causing her symptoms. (R. at 311.) She was diagnosed with anxiety. (R. at 312.) On August 9, 2009, an x-ray of Leonard's left knee showed joint effusion. (R. at 291.)

The record shows that Leonard received treatment from Dr. R. Michael Moore, M.D., from February 2007 through May 2011. (R. at 279-88, 290-93, 296-98, 300-02, 330-34, 337-39.) During this time, Dr. Moore diagnosed Leonard with fibromyalgia syndrome, anxiety disorder, chronic back strain, gastroesophageal reflux disorder, ("GERD"), and depression. (R. at 279-88, 290-93, 296-98, 330-34.) On February 27, 2007, Leonard complained of fibromyalgia syndrome, anxiety and chronic back strain. (R. at 288.) Dr. Moore diagnosed fibromyalgia syndrome, anxiety disorder, chronic back strain and GERD. (R. at 288.) On May 29, 2007, Leonard continued to complain of fibromyalgia syndrome, anxiety disorder and chronic back strain. (R. at 287.) On August 31, 2007, Leonard reported that she was experiencing worsening panic attacks. (R. at 286.) Her lower back was reported to be stiff and tender. (R. at 286.) On November 30, 2007, Leonard continued to complain of fibromyalgia syndrome and anxiety. (R. at 285.)

On January 24, 2008, Leonard complained of chest congestion, shooting pain in her legs and shaking. (R. at 284.) Dr. Moore noted that Leonard's lungs were clear, and he referred her to a gynecologist. (R. at 284.) On February 22, 2008, Leonard complained of chronic back pain. (R. at 283.) Physical examination

revealed a low back strain. (R. at 283.) On May 23, 2008, Leonard complained of fibromyalgia and anxiety symptoms. (R. at 282.) Progress notes failed to note any remarkable clinical findings. (R. at 282.) On August 22, 2008, Leonard reported that she could not be around people or crowds. (R. at 281.) She reported that her panic symptoms had worsened and that she could not go to the grocery store. (R. at 281.) On November 20, 2008, Leonard complained of fibromyalgia syndrome and anxiety. (R. at 280.) On February 19, 2009, Leonard continued to complain of fibromyalgia syndrome and anxiety. (R. at 279.) On May 19, 2009, and August 19, 2009, Leonard complained of fibromyalgia syndrome and anxiety. (R. at 292-93.) On November 18, 2009, Leonard complained of fibromyalgia syndrome and anxiety. (R. at 290.) On February 18, 2010, Leonard complained of chronic back pain. (R. at 298.) On May 26, 2010, Leonard complained of chronic back pain. (R. at 296.) Her low back was stiff and tender to palpation. (R. at 296.) On August 26, 2010, Leonard complained of anxiety, head congestion and coughing. (R. at 334.)

On August 17, 2010, Dr. Moore completed a medical assessment indicating that Leonard could occasionally lift and carry items weighing up to five pounds and could frequently lift and carry items weighing up to two pounds. (R. at 300-02.) He opined that Leonard could stand and/or walk a total of three hours in an eight-hour workday and that she could do so for up to 20 minutes without interruption. (R. at 300.) Dr. Moore opined that Leonard could sit for up to three hours in an eight-hour workday and that she could do so for up to 30 minutes without interruption. (R. at 301.) He opined that Leonard could never climb, stoop, kneel, balance, crouch or crawl. (R. at 301.) Dr. Moore opined that Leonard's abilities to reach, push and pull were affected by her impairments. (R. at 301.) He

found that Leonard's abilities to work around heights, moving machinery and vibration were limited. (R. at 302.) Dr. Moore opined that Leonard would be absent from work more than two days a month due to her impairments. (R. at 302.)

That same day, Dr. Moore completed a mental assessment indicating that Leonard had a limited, but satisfactory, ability to relate to co-workers, to maintain personal appearance and to behave in a emotionally stable manner. (R. at 337-39.) He also reported that Leonard had a seriously limited ability to follow work rules, to deal with the public, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out detailed and simple instructions, to relate predictably in social situations and to demonstrate reliability. (R. at 337-38.) Dr. Moore opined that Leonard had no useful ability to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out complex job instructions. (R. at 337-38.) He opined that Leonard would miss more than two days of work a month due to her impairments. (R. at 339.) Dr. Moore based these findings on Leonard's diagnoses of depression and generalized anxiety disorder. (R. at 337.)

On November 29, 2010, Leonard complained of depression and chronic back strain. (R. at 332.) On February 28, 2011, Leonard complained of fibromyalgia syndrome and anxiety. (R. at 331.) Dr. Moore noted multiple trigger points in Leonard's lower back. (R. at 331.) On May 26, 2011, Leonard complained of fibromyalgia syndrome and anxiety. (R. at 330.)

On June 15, 2009, Dr. Michael Hartman, M.D., a state agency phyisican,

noted that the medical evidence between January 2008 and May 2008 revealed that Leonard experienced some pain in her legs, but prior to her date last insured of June 30, 2008, there was no evidence containing range of motion or muscle strength throughout. (R. at 59-60.) Leonard's cardiovascular system had regular rate and rhythm without murmurs, gallops or rubs, and her lungs were clear to auscultation. (R. at 59.) Dr. Hartman noted that the record revealed a diagnosis of anxiety, but the record failed to provide further explanation. (R. at 59.) Therefore, Dr. Hartman opined that Leonard did not have a severe impairment. (R. at 60.)

On June 16, 2009, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Leonard suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 60-61.) Perrott opined that Leonard had mild restrictions on activities of daily living and in maintaining concentration, persistence or pace. (R. at 60.) He found that Leonard had no restrictions on her ability to maintain social functioning. (R. at 60.) He noted that the medical evidence did not indicate the presence of a severe and disabling mental impairment. (R. at 61.)

On February 26, 2010, Dr. Brian Strain, M.D., a state agency physician, reported that the medical evidence prior to Leonard's date last insured was insufficient to establish a severe impairment. (R. at 67-68.) Dr. Strain noted that the medical evidence between January 2008 and May 2008 revealed that Leonard experienced some pain in her legs, but prior to her date last insured of June 30, 2008, there was no evidence containing range of motion or muscle strength throughout. (R. at 67.) Leonard's cardiovascular system had regular rate and

rhythm without murmurs, gallops or rubs, and her lungs were clear to auscultation. (R. at 67.) Dr. Strain noted that the record revealed a diagnosis of anxiety, but the record failed to provide further explanation. (R. at 67.) On March 1, 2010, Dr. Strain noted that the medical records did not document serious joint deformity or nerve and muscle damage due to fibromyalgia, back problems or arthritis. (R. at 70.) Dr. Strain noted that Leonard was not seriously underweight or malnourished due to stomach blisters. (R. at 70.) He noted that, prior to Leonard's date last insured, the record did not document serious problems with anxiety or depression that would restrict her ability to care for herself. (R. at 70.)

On February 26, 2010, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a PRTF indicating that, prior to her date last insured, Leonard suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 68-69.) Milan opined that there was insufficient evidence to determine if Leonard had restrictions on her activities of daily living. (R. at 68.) He found that Leonard had mild restrictions in maintaining concentration, persistence or pace. (R. at 68.) He found that Leonard had no restrictions on her ability to maintain social functioning and that she had not experienced any episodes of decompensation. (R. at 68.)

On August 2, 2011, Dr. Lee T. Besen, M.D., reviewed the medical evidence and opined that there was no history or physical findings in the record to substantiate a diagnosis of fibromyalgia, that imaging and physical data failed to support Leonard's complaints of chronic low back pain, that minimal documentation existed to determine the severity of Leonard's depression and that

Leonard did not meet or equal a listing. (R. at 263, 341, 350.)

On August 12, 2011, Dr. Besen completed a medical assessment indicating that Leonard could occasionally lift and carry items weighing up to 100 pounds and frequently lift and carry items weighing up to 20 pounds. (R. at 351-56.) He opined that Leonard could sit a total of six hours in an eight-hour workday and that she could do so for up to three hours without interruption. (R. at 352.) He found that Leonard could stand and/or walk a total of three hours in an eight-hour workday and that she could do so for up to two hours without interruption. (R. at 352.) Dr. Besen opined that Leonard could frequently reach, handle, finger, feel and push/pull with both hands. (R. at 353.) He also found that Leonard could frequently use her feet to operate foot controls. (R. at 353.) Dr. Besen found that Leonard could occasionally climb stairs, ramps, ladders and scaffolds and frequently balance, stoop, kneel, crouch or crawl. (R. at 354.) He found that Leonard could occasionally work around unprotected heights and moving machinery and frequently operate a motor vehicle, work around humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat and vibrations. (R. at 355.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Leonard argues that the ALJ improperly determined her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Leonard contends that the ALJ failed to illustrate specific work-related activities affected by her moderate difficulties in maintaining concentration, persistence or pace. (Plaintiff's Brief at 5.) She further argues that the ALJ failed to set out his findings in terms of a function-by-function assessment mandated by Social Security Ruling 96-8p. (Plaintiff's Brief at 5.) Finally, Leonard argues that the ALJ failed to adhere to the treating physician rule and give controlling weight to the opinion of Dr. Moore. (Plaintiff's Brief at 5-6.)

The ALJ found that the medical evidence established that, through the date last insured, Leonard suffered from severe impairments, namely fibromyalgia, chronic lower back pain and depression, but he found that Leonard did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ also found that, through the date last insured, Leonard had the residual functional capacity to perform sedentary work that allowed for moderate difficulties in maintaining concentration, persistence or pace. (R. at 18.)

Leonard contends that the ALJ failed to illustrate specific work-related activities affected by her moderate difficulties in maintaining concentration, persistence or pace. (Plaintiff's Brief at 5.) She further argues that the ALJ failed to set out his findings in terms of a function-by-function assessment mandated by Social Security Ruling 96-8p. (Plaintiff's Brief at 5.) While Leonard is correct when she states that Social Security Ruling 96-8p requires the ALJ to specify beyond "moderate difficulties in maintaining concentration, persistence or pace," a review of the hearing transcript indicates that the ALJ did elaborate these restrictions in the hypothetical presented to the vocational expert. (R. at 50-52.) The ALJ explained in his hypothetical that by "moderate" he meant that it would take an individual a bit longer to complete a task, no abandonment of task, and that she would be able to complete a full workday. (R. at 52.) The vocational expert responded by testifying that there would be a significant number of jobs in the national economy that such an individual could perform. (R. at 52.)

Leonard also argues that the ALJ erred by failing to give controlling weight to her treating source, Dr. Moore. (Plaintiff's Brief at 5-6.) After a review of the

evidence of record, I find Leonard's argument on this point unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to Dr. Moore's opinion because it was not supported by the record, including Dr. Moore's own treatment notes. (R. at 21.) The ALJ noted that Dr. Moore's August 17, 2010, assessments were rendered more than two years after Leonard last met the disability insured status. (R. at 21.) The ALJ gave greater weight to the opinion of Dr. Besen. (R. at 20.) In August 2011, Dr. Besen reviewed the medical evidence and opined that there was no history or physical findings in the record to substantiate a diagnosis of fibromyalgia, that imaging and physical data failed to support Leonard's complaints of chronic low back pain, that minimal documentation existed to determine the severity of Leonard's depression and that Leonard did not meet or equal a listing. (R. at 263, 341, 350.)

While Dr. Moore diagnosed Leonard with fibromyalgia syndrome, anxiety

disorder, chronic back strain, GERD and depression, he failed to note any remarkable clinical findings. (R. at 279-88, 290-93, 296-98.) The ALJ noted that the record did not contain objective clinical findings to support Dr. Moore's assessments. (R. at 21.) In June 2009 and February 2010, two state agency physicians found that the medical evidence between January 2008 and May 2008 revealed that Leonard experienced some pain in her legs, but prior to her date last insured of June 30, 2008, there was no evidence containing range of motion or muscle strength throughout. (R. at 59-60, 67.) Leonard's cardiovascular system had regular rate and rhythm without murmurs, gallops or rubs, and her lungs were clear to auscultation. (R. at 59, 67.) It was noted that the record revealed a diagnosis of anxiety, but the record failed to provide further explanation. (R. at 59, 67.) Therefore, both physicians opined that Leonard did not have a severe impairment. (R. at 60, 68.) In March 2010, Dr. Strain noted that the medical records did not document serious joint deformity or nerve and muscle damage due to fibromyalgia, back problems or arthritis. (R. at 70.) Dr. Strain noted that Leonard was not seriously underweight or malnourished due to stomach blisters. (R. at 70.) He noted that, prior to Leonard's date last insured, the record did not document serious problems with anxiety or depression that would restrict her ability to care for herself. (R. at 70.)

Two state agency psychologists opined that Leonard suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 60-61, 68.) They also noted that the medical evidence did not indicate the presence of a severe and disabling mental impairment. (R. at 61.)

Based on this, I find that the ALJ properly weighed the medical evidence of

record. I also find that substantial evidence exists to support the ALJ's finding with regard to Leonard's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical and psychological evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Leonard's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Leonard was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Leonard's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: May 13, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE